UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN E. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00804-JMS-KMB |
| | ) | |
| MICHAEL MITCHEFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| INDIANA DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| Interested Party.[1] | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Kevin Smith, an Indiana Department of Correction (IDOC) inmate, filed this action under 42 U.S.C. § 1983 based on allegations that defendants failed to provide him with adequate medical care for his arm and shoulder and retaliated against him. Dkt. 42. Mr. Smith's First and Eighth Amendment federal claims, and state-law negligence claims, proceed against the nine individual defendants. Dkt. 56. An Eighth Amendment claim also proceeds against Wexford of Indiana, LLC (Wexford). *Id.* Defendants have moved for summary judgment in their favor.

For the reasons explained below, defendants' motion, dkt. [117], is **GRANTED**, and **the clerk is directed** to enter final judgment.

---

[1] The IDOC appeared as an interested party in this action on February 20, 2023, to respond to discovery issues Mr. Smith raised related to his non-party subpoenas. *See* dkt. 111 (notice of appearance). Discovery closed in this matter on April 3, 2023, and all discovery disputes have been resolved. Therefore, **the clerk is directed to terminate the IDOC as an interested party on the docket.**

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A).[2] Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

---

[2] The Court reminds the defendants that in the future all "[r]eferences to exhibits submitted in support of the motion for summary judgment must not be to the BATES label, but should be to the page number (or paragraph number, as appropriate)." Dkt. 64 at 5 (pretrial scheduling order).

## II. Factual Background

The following statement of facts was evaluated under the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to the non-moving party. *See Reaves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### A. The Parties

Mr. Smith is an IDOC inmate, and he was housed at Wabash Valley and New Castle Correctional Facilities at all relevant times. Dkt. 119-13 at 3 (Smith's first deposition). Mr. Smith's allegations relate to medical treatment for his arm and shoulder, from approximately March 2019 to the filing of this lawsuit in March 2021. *Id.*

Wexford was the medical provider for the IDOC during the times relevant to Mr. Smith's complaint. The individual defendants were Wexford employees.

Dr. Byrd is a licensed physician in Indiana and was employed as the Medical Director at Wabash Valley. Dkt. 119-4, ¶¶ 1-2 (Byrd affidavit). Dr. Byrd saw Mr. Smith multiple times between March 2019 and July 2019. *See generally id.* Dr. Rajoli is a licensed physician in Indiana and was employed at Wabash Valley. Dkt. 119-5, ¶¶ 1-2 (Rajoli affidavit). Dr. Rajoli saw Mr. Smith multiple times between May 2019 and June 2019. *See generally id.*

Registered Nurse Kim Hobson was employed as the Health Services Administrator (HSA) at Wabash Valley. Dkt. 119-6, ¶¶ 1-2 (Hobson affidavit). HSA Hobson's role was "primarily administrative in nature," and she did not provide direct patient care but oversaw provision of medical services. *Id.*, ¶ 3. She ensured staff compliance with IDOC directives, oversaw the nursing staff, and responded to inmates' medical grievances and requests for healthcare forms. *Id.* HSA

Hobson did not have the authority to diagnose patients or order specific medical care at Wabash Valley. *Id.*, ¶ 12.  HSA Hobson attests that she does not recall personally meeting with Mr. Smith and that to her knowledge her involvement was limited to a review of Mr. Smith's medical and grievance records. *Id.*, ¶ 11. HSA Hobson attests that she was not involved in the investigation or responses to Mr. Smith's relevant grievances. *Id.*, ¶ 10.

Dr. Nwannunu is a licensed physician in Indiana and was employed at New Castle. Dkt. 119-11, ¶¶ 1-2 (Nwannunu affidavit). He saw Mr. Smith several times after Smith was transferred from Wabash Valley to New Castle in July 2019. *See generally id.* Dr. Falconer is a licensed physician in Indiana and was employed as the Medical Director at New Castle. Dkt. 119-8, ¶¶ 1-2 (Falconer affidavit). Dr. Falconer saw Mr. Smith "on very few occasions," as he was not Smith's primary provider when he was transferred to New Castle. *See generally id.*

Sarah Lawson (formerly known as Sarah Martin)[3] is a licensed practical nurse (LPN) in Indiana and was employed at New Castle. Dkt. 119-9, ¶¶ 1-2 (Lawson affidavit). Her responsibilities included "providing nursing services as directed by [her] supervisors and onsite practitioners," which consisted of carrying out physician's orders like "dispensing medications, scheduling appointments, or meeting with patients to discuss" medical concerns. *Id.*, ¶ 3. Nurse Lawson did not have authority to diagnose patients or order specific medical care for them. *Id.* Nurse Lawson saw Mr. Smith several times when she attempted to dispense his medication in December 2019. *See generally id.*

Rachel Schilling and Lisa Hord were both employed as HSAs at New Castle. Dkt. 119-10, ¶¶ 1-2 (Schilling affidavit); dkt. 119-12, ¶¶ 1-2 (Hord affidavit). Similar to HSA Hobson's role, their roles were "primarily administrative in nature," and they did not provide direct patient care

---

[3] **The clerk is directed to update** this defendant's name as Nurse Lawson on the docket.

but oversaw provision of medical services. Dkt. 119-10, ¶ 2; dkt. 119-12, ¶ 2. They ensured staff compliance with IDOC directives, oversaw the nursing staff, and responded to inmates' medical grievances and requests for healthcare forms. Dkt. 119-10, ¶ 2; dkt. 119-12, ¶ 2. HSA Schilling attests that beyond her response to a grievance Mr. Smith filed in August 2020, she was not involved in his medical care at New Castle. Dkt. 119-10, ¶ 7. HSA Hord attests that she did not meet directly with Mr. Smith but was involved in responding to some of his formal grievances in early 2020. Dkt. 119-12, ¶ 4, 6.

Dr. Michael Mitcheff is a licensed physician in Indiana and was employed by Wexford as the Regional Medical Director. Dkt. 119-7, ¶¶ 1-2 (Mitcheff affidavit). Dr. Mitcheff's responsibilities included "providing leadership in administrative matters, clinical program development, quality management, staff education, and leadership development[.]" *Id.*, ¶ 3. While he did "not routinely meet with or directly treat the offenders," he actively engaged "with onsite medical staff in helping to identify and facilitate the solving of all operational and clinical issues for Wexford sites throughout the state of Indiana." *Id.*, ¶¶ 3-4.

### B. Plaintiff's Medical History

In September 1998, before his incarceration, Mr. Smith was shot nine times, his elbow was shattered, and he was left with a 90-degree bend and only a 10-degree range of motion. *See, e.g.* dkt. 119-7, ¶ 8 ("Mr. Smith had a history of a gunshot wound to the right elbow, which resulted in multiple surgeries and poor range of motion."); dkt. 134 at 200-204 (offsite surgeon's notes). In early 2019, after Mr. Smith was incarcerated, he was evaluated by an offsite general orthopedic surgeon, and his chief complaint was pain and the loss of range of motion in his elbow. Dkt. 134 at 204. The surgeon recommended "a bone excision with ulnar nerve transposition and capsular release," and this procedure was approved by Dr. Mitcheff. Dkt. 119-7, ¶ 8; dkt. 119-2 at 1-4. The

surgeon's notes indicate that he stressed to Mr. Smith that the elbow surgery "will likely not treat pain." Dkt. 134 at 200, 204, 229, 245 ("I explained I cannot assist with any pain control because [of] the arthritis, but I could possibly assist with range of motion . . . . He understood the risks and wished to proceed with surgical intervention."). Mr. Smith elected to have the surgery, and it was performed on March 21, 2019. *Id.* at 358 (Smith affidavit); *id.* at 198-211 (Smith's exhibits). Mr. Smith was discharged the same day. *Id.* at 203 ("Patient expressed frustration regarding discharge. Guards explained to patient that Wexford decides when patient should be returned to facility.").[4]

### C. Plaintiff's Medical Interactions at Wabash Valley—March 2019 to July 2019

#### 1. Wabash Valley Infirmary

Dr. Byrd saw Mr. Smith on March 15, 2019, prior to his scheduled elbow surgery. Dkt. 119-1 at 43-45 (defendants' designated medical records). The medical record indicates Mr. Smith discussed the treatment of his chronic pain and reported that Trileptal caused him nausea and requested that Neurontin be renewed for joint pain and pain related to his degenerative spine disease. *Id.* Dr. Byrd discussed multiple options for pain, discontinued Trileptal, and Mr. Smith agreed to a trial of Keppra for pain. *Id.* Mr. Smith also had an active prescription for Tylenol Extra Strength at this time. *Id.*[5] Dkt. 119-4, ¶¶ 5.

---

[4] While Mr. Smith attests that his discharge from the hospital was against the surgeon's recommendations, he has not designated any admissible evidence to support that assertion, and the Court discerns no supporting evidence in the medical records related to the surgery. Dkt. 132 at 4; dkt. 134 at 200 ("DOC RN CM, Janet requesting dc pt to DOC infirmary [Mar. 21, 2019] stating they will finish the iv Toradol course. Ortho updated and in agreement."). The surgeon's notes indicate that Mr. Smith "was discharged to prison in stable condition." Dkt. 134 at 198.

[5] While Mr. Smith contends that Trileptal and Keppra are not appropriate drugs for pain management, he is not a medical expert and is not qualified to offer an opinion on the matter. *See, e.g.*, dkt. 132 at 15 (Smith admits to having no medical knowledge). Moreover, Dr. Byrd attests that pharmaceutical drugs may be used for multiple purposes, and "[w]hile Keppra is an FDA-approved medication commonly used to treat seizures, new medical data has shown that when used with other specific treatments can provide relief to

The surgeon performed Mr. Smith's elbow surgery on March 21, 2019, and instructed him afterwards to "keep pin sites clean and dry," to change the dressing as needed, and to follow-up in two weeks. Dkt. 134 at 198. Mr. Smith now had an external fixator system in his arm.[6] *Id.* Mr. Smith's discharge medication list called for Toradol, Naproxen (which was not specifically for pain but to prevent heterotopic ossification[7] (HO)), and Oxycodone-Acetaminophen (commonly known as Percocet) every four hours as needed for "severe" pain for up to seven days. *Id.* at 199, 202. Mr. Smith was to follow-up with the surgeon in the next month. *Id.* at 211.

After surgery, Dr. Mitcheff recommended that Mr. Smith be closely monitored for approximately two weeks post-operation. Dkt. 119-7, ¶ 8; dkt. 119-2 at 1-4. Mr. Smith was placed in the infirmary when he returned to Wabash Valley. Dkt. 119-13 at 4. Mr. Smith was evaluated by an onsite nurse in the infirmary and on March 22, 2019, he received two doses of Tylenol-Codeine #3 (Tylenol 3) and two doses of Toradol for pain. Dkt. 119-6, ¶ 5; *see also* dkt. 119-1 at 102 (medication notes). "There were no orders for therapy to be started at that time as Plaintiff still had the external fixator in his arm." Dkt. 119-6, ¶ 5.[8] Dr. Byrd attests that during Mr. Smith's

---

patients with a wide range of chronic pain syndromes." Dkt. 119-4, ¶ 5. Dr. Nwannunu attests that "Trileptal is an FDA-approved medication that is used to decrease nerve impulses that can cause pain." Dkt. 119-11, ¶ 6.

[6] "External fixators are metal devices that are attached to the bones of the arm, leg, or foot with threaded pins or wires. The threaded pins or wires pass through the skin and muscles and are inserted into the bone. The majority of the device is outside of the body, which is why it is called an external fixator." *See What are external fixators?*, *available at* www.limblength.org (last visited Mar. 15, 2024).

[7] Heterotopic ossification (HO) is "the formation of bone outside the normal skeleton" which "can occur in soft tissue and is usually found within muscular, adipose, or non-muscle fibrous or connective tissue." *See Diagnostic approach to disorders of extraskeletal bone formation*, *available at* www.mayoclinic.org (last visited Mar. 20, 2024).

[8] Mr. Smith claims there were such orders at that time, but he does not establish that he has firsthand knowledge of that, nor does he designate any admissible evidence to support that assertion. The references to therapy in the offsite providers' notes were not active orders, let alone orders that Mr. Smith receive therapy immediately. *See* dkt. 134 at 198-211 (patient to remain non-weight bearing to right upper extremity

incarceration at Wabash Valley, the surgeon never recommended that he begin physical therapy. Dkt. 119-4, ¶ 20 ("The condition of the right elbow was far too fragile for many weeks to even consider beginning physical therapy. It is likely that once the external fixator was removed, Mr. Smith would have been a good candidate for physical therapy at some point.").

Mr. Smith attests he spoke with HSA Hobson when he was admitted to the infirmary, after he returned from the hospital, and that HSA Hobson told him it was too late in the afternoon to get his prescription for Percocet, but that she had it, and that he would get it the next day.[9] Dkt. 134 at 359 (Smith "reluctantly agreed as she insured that I would get some pain medication in the meantime."). Mr. Smith's skilled care records from March 2019 indicate that he received Toradol as directed, and that he was given Tylenol 3 every six hours, for several days, until Percocet could be obtained from the pharmacy. *Id.* at 11.

Mr. Smith's interim Tylenol 3s were prescribed "PRN," meaning as needed. *Id.* at 12 ("his Tylenol #3's were PRN's [and] he needed to ask for those."); dkt. 119-6, ¶ 6; dkt. 119-1 at 101-02. Mr. Smith also received Keppra. Dkt. 119-6, ¶ 6; dkt. 119-1 at 101-02. The medical record indicates Mr. Smith was advised to leave his surgical site alone but that he was "constantly touching [the] dressing when he is awake," that he removed the Velcro case from his arm, and that he requested pain medication "constantly," at times by "peck[ing] on his window." Dkt. 134 at 12-13 (At times "he has to be reminded that his medication is not due yet."). Concerning any non-compliance, Mr. Smith contends he was "doing all he could" to comply with the surgeon's directions. Dkt. 132 at 5. Mr. Smith attests he did not receive Percocet over that weekend, from

---

and restricted range of motion of 45-130 degrees of right elbow; "Pt will benefit from skilled OT while in hospital as when he returns to his facility.").

[9] HSA Hobson attests that she did not recall personally meeting with Mr. Smith while he was at Wabash Valley, but the Court accepts Mr. Smith's version of events as true for purposes of summary judgment. Dkt. 119-6, ¶ 4.

March 22 to March 25, 2019. Dkt. 134 at 359. Mr. Smith does not dispute that he was receiving Tylenol 3 during this interim period but said it did "little to no good," and thus, it was "inadequate pain medication." Dkt. 132 at 5.

On March 25, 2019, Dr. Byrd met with Mr. Smith in the infirmary for follow-up care after his surgery. Dkt. 119-4, ¶ 6. Mr. Smith was concerned about not having received Percocet and about a large bullae, or blister, that had developed over his right elbow. *Id.* Regarding the first concern, Mr. Smith attests that Dr. Byrd told him the surgeon's office had not sent a prescription for Percocet, but Smith believed this was wrong because HSA Hobson told him it had been sent. Dkt. 134 at 360. Dr. Byrd attests that he explained that Percocet "had to first be approved by medical leadership before being distributed in the prison setting, but while we waited for approval, we discussed Plaintiff's pain management regimen and what medication he would be provided to ensure proper pain relief." Dkt. 119-4, ¶ 6; *see also* dkt. 119-1 at 38-42 ("I advised him Rx was not sent with him. He was told it would be."). Dr. Byrd explained to Mr. Smith that Tylenol 3, the pain medication he was given in the interim, was an analgesic equivalent to Percocet. Dkt. 119-1 at 38-42 ("Mr. Smith is getting 90 mg of codeine Q6hrs PRN for opiate pain management. I advised him 200mg of Codeine is considered an analgesic equivalent to 20mg-30mg of oxycodone. This would translate into 10mg of Oxycodone being equivalent to 100mg of Codeine at worst. We are clearly near recommended opiate analgesic dosage."). Dr. Byrd advised Mr. Smith that the transition to Percocet would be made in the "next 24 hours or so," but that he expected Smith to have "quite a bit of pain" given the procedure that he had. *Id.* at 35, 38-42 (Percocet was approved and arrived Mar. 26, 2019).

Related to Mr. Smith's concern about the large bullae, Dr. Byrd sent pictures of it to the surgeon's office for review, and the surgeon recommended to gauze the region and to do daily

dressing changes. *Id.* at 38-42; *see also* dkt. 119-4, ¶ 6 ("Plaintiff was reassured [the surgeon] was aware of the skin changes and this recommendation regarding the dressing change was coming from him."). Dr. Byrd ordered Mr. Smith to receive daily dressing changes, an intravenous saline and Toradol drip, and Naproxen to start the next day. Dkt. 119-4, ¶ 6; dkt. 119-1 at 38-42. The medical record indicated that Dr. Byrd would discuss the Percocet prescription with Dr. Rajoli and the Tylenol 3 was to be continued "per Dr. Mitcheff for now." Dkt. 119-1 at 40.

Dr. Byrd saw Mr. Smith again the next day and noted that Percocet had been approved and would arrive later on March 26, 2019, at which point, Tylenol 3 would be discontinued. *Id.* at 35-37. Mr. Smith had Keppra at this time and was due to start Naproxen on March 27, 2019. *Id.* Mr. Smith does not dispute that he did receive Percocet after this time but believed it was "barely helping" and was not lasting beyond four to five hours. Dkt. 132 at 5; dkt. 134 at 360 (Smith attests that the Percocet "helped a little more than the prior medication," but it would wear off after a couple of hours.).

By March 29, 2019, Mr. Smith was on doxycycline to address concerns related to infection, and the medical record indicates he reported that Tylenol 3 "was superior to present Percocet order," so Percocet was discontinued, and Tylenol 3 was resumed. Dkt. 119-1 at 32-34; dkt. 119-4, ¶ 8 (Dr. Byrd attests "Plaintiff's pain medication [was] changed as directed by" Dr. Mitcheff.). Mr. Smith does not dispute that he voiced a complaint about Percocet, and that despite it helping "some," he believed it "should be more effective and last closer to the time of [the] next dose." Dkt. 132 at 7. That day, Mr. Smith also informed a nurse that a screw came out of the external fixator system, and she reported the situation to Dr. Byrd.[10] Dkt. 134 at 21. Mr. Smith's follow-up

---

[10] Mr. Smith attests that the screw fell out in the shower and that he requested that Dr. Byrd put it back in, but that Dr. Byrd would not touch it. Dkt. 134 at 363 ("He is a Doctor, I'm an Auto Mechanic by trade and we could have fixed the single screw but Dr. Byrd would not touch it[.]").

appointment with the surgeon was moved up to address the issue after pictures of the hardware were emailed to the surgeon for review. *Id.* Dr. Byrd continued orders for dressing changes and antibiotics. Dkt. 119-4, ¶ 8. Mr. Smith had Keppra and Naproxen at this time. Dkt. 119-1 at 34.

On April 1, 2019, Dr. Byrd saw Mr. Smith and addressed concerns of possible allergic reaction to the hardware. Dkt. 119-4, ¶ 9. Antibiotics had already been prescribed and the dressing was clean, dry, and intact. *Id.* Mr. Smith was to see the surgeon the next day, so all current orders regarding his care remained in place, including pain medications, until further orders from the surgeon's evaluation. *Id.* Dr. Byrd noted that medication would be adjusted as indicated by the surgeon. Dkt. 119-1 at 28-30 ("We will adjust meds as indicated per Ortho."); dkt. 134 at 26-27.

Mr. Smith went to the surgeon's office on April 2, 2019, but did not see the surgeon directly. The purpose of this visit was to repair the external fixator system, and the repair was done by other staff at the surgeon's office. Dkt. 134 at 365. Medical notes from that encounter indicate the "elbow hinge had a screw fall out," that it was repaired, and that Mr. Smith was "very infuriated over his pain medication situation." *Id.* at 212. ("He was very aggressive over the placement over the bars of his ex fix . . . . We did stress to the patient that he should not tamper with any components of his external fixator.").[11] Mr. Smith thought the external fixator hinge was not properly placed at this time, and he addressed his concerns with the surgeon directly a week later, when he returned for follow-up and necessary adjustments were made. Dkt. 119-1 at 21; dkt. 134 at 365.

---

[11] The medical record indicates that Mr. Smith continued to touch and manipulate the pins and hardware. Dkt. 134 at 28-30, 33-35, 40-41, 43, 45 (Apr. 2, 3, 5-7, 10-14, 2019, skilled care observations). The medical record indicates Mr. Smith was also non-compliant with dressing changes. *Id.* at 41, 47. At times, he also refused to take Keppra and Lactulose, and those orders were discontinued. *Id.* at 43, 45. Other observations included that Mr. Smith tried to manipulate a nurse to give him his PRN medication before the scheduled time. *Id.* at 54.

Mr. Smith saw Dr. Byrd on April 4, 2019. Dkt. 119-4, ¶ 10. "The order for Tylenol-3 was decreased after Plaintiff's pain management was discussed with Dr. Rajoli."[12] *Id.*; dkt. 119-1 at 23. Mr. Smith still had orders for Keppra and Naproxen. Dkt. 119-1 at 23. Dr. Byrd noted that Mr. Smith did not appear to be in any significant pain and that his vitals did not suggest uncontrolled pain. *Id.* at 26. The medical record indicated Mr. Smith "refuses to wear immobilizer or sling." Dkt. 134 at 31-32, 38.

By April 10, 2019, the surgeon had properly adjusted the placement of the hinge to improve Mr. Smith's range of motion, and Dr. Byrd evaluated him in the infirmary. Dkt. 119-1 at 21. Dr. Byrd had previously sought and received recommendations from the surgeon, and he noted that he sent those to the Regional Medical Director and that "T3s 2 tabs tid [were] recommended." *Id.* ("He seemed satisfied that we are making every effort to ensure his pain management needs were being met."). Dr. Byrd attests that Mr. Smith was "doing fairly well considering the complex nature of the surgery he received," and would remain on pain medication until his scheduled follow-up with the surgeon in May 2019. Dkt. 119-4, ¶ 11.

On April 15, 2019, Dr. Byrd met with Mr. Smith to go over the Tylenol 3 as ordered and continued orders for antibiotics and dressing changes and addressed skin changes around the surgical sites. *Id.*, ¶ 12; dkt. 119-1 at 18-20 ("No change in care as doing well. Tylenol with Codeine being managed by RMD. Continue until f/u with [surgeon]."). Dr. Byrd's notes indicated that the surgeon's nurse informed him that "opiate analgesics will be needed as long as external fixator remains in place." Dkt. 119-1 at 18 ("RMD contacted via e-mail, and T3s 2 tabs tid recommended.").

---

[12] Dr. Byrd noted that Dr. Rajoli was in favor of discontinuing opiates, but after discussion, determined it was reasonable to continue them at a reduced dose. Dkt. 119-1 at 25. Mr. Smith "was not at all pleased with [the] change in pain medication," and Dr. Byrd advised him he would contact the surgeon's nurse "for their recommendations as it relates to opiate management of patients with external fixators." *Id.*

On April 22, 2019, Mr. Smith had a follow-up appointment with the surgeon, and afterward, he met with Dr. Byrd. Dkt. 119-2 at 2 (follow-up appointment with surgeon approved by Dr. Mitcheff); dkt. 119-7, ¶ 10. Dr. Byrd addressed Mr. Smith's concerns about the timing of his pain medication. Dkt. 134 at 55. Because the opiates were PRN only, the time Mr. Smith received the dose was written down. *Id.* He could not get his next dose until eight hours from that time. *Id.*

Dr. Byrd attests that he was notified on April 23, 2019, that Mr. Smith threatened staff while in the infirmary "arguing that he was not getting his pain medication in a timely manner."[13] Dkt. 119-4, ¶ 13. A non-defendant custody officer and nurse determined that Mr. Smith's transfer to the Custody Control Unit (CCU) at Wabash Valley was appropriate to address his behavior and because he would be isolated from other inmates in order to protect the external fixator.[14] *Id.*

---

[13] From the skilled care notes on April 23, 2019: "This nurse gave medications and attempted to educate offender on medication administration. Offender started yelling and became belligerent. Officer Foster attempted to deescalate the situation . . . . Offender remained belligerent and continued to yell in his cell." Dkt. 134 at 58.

Dr. Byrd's provider infirmary discharge notes state: "Today I was called in Chronic Care Clinic on other side of camp with reports [he] was threatening to tear his cell apart due to not getting pain medication in a timely manner. Lt. Ewers and Nurse Conner discussed situation and felt transfer to CCU was appropriate as he will still be isolated from other offenders with external fixator in place, and CCU is better equipped to deal with such behavior." *Id.* at 60.

Mr. Smith has a pending action in this District against custody Officer Foster related to this incident in *Smith v. Foster*, No. 1:22-cv-00404-JRS-CSW, where an Eighth Amendment claim proceeds based upon his allegations that Officer Foster impeded his access to pain medication and medical treatment when she placed him on a medical hold in the CCU, *see* dkt. 16 (screening order).

[14] Mr. Smith believes Dr. Byrd and HSA Hobson were responsible for his discharge from the infirmary. Dkt. 132 at 6, 10. But Mr. Smith's testimony does not create a genuine issue of material fact as to this issue. For, example, he testified that "the officer is the one that initiated everything," and that Dr. Byrd was not in the infirmary during the incident. Dkt. 119-13 at 4, 7. He then testified that officers who escorted him to the CCU told him that HSA Hobson told them to send Smith there. *Id.* at 8; *see also* dkt. 134 at 367 ("Smith [pled] with the officers to contact Ms. Hobson or Dr. Byrd, the officers responded, 'They are the ones that said to send you to lock up.'"). Mr. Smith's testimony that other staff told him Dr. Byrd and HSA Hobson sent him to the CCU is inadmissible hearsay, and thus, cannot defeat summary judgment. *See Cairel v. Alderden,* 821 F.3d 823, 830 (7th Cir. 2016).

Mr. Smith was discharged from the infirmary but "would still have regular access to onsite medical staff and medical treatment." *Id.*; *see also* dkt. 134 at 57-59 (Medical notes say "[p]er Dr. Byrd offender discharged from infirmary.").

Mr. Smith testified about the custody officer's demeanor during the incident, but his own testimony does not dispute that he was disruptive. Specifically, he testified that: "She just went flying off the handle . . . just totally out of line. When you get like that towards me, I'm going to turn around and get the same way towards you." Dkt. 119-13 at 10. He further admitted to putting his bed up on a 90-degree angle so he could look over the curtain barrier at the staff involved. *Id.* ("I was just playing into it. And I was kind of foolish, but I sat on top of the bed, and I started waving at everybody and kind of smiling and laughing."). The record includes the conduct report and prison disciplinary documents related to a charge of violating IDOC Adult Disciplinary Code B-360 for Mr. Smith being disruptive. *See* dkt. 133 at 9-13; dkt. 119-3 at 24 (found guilty on May 10, 2019, sanctions were lost privileges only).

### 2. Wabash Valley CCU

On April 25, 2019, Mr. Smith submitted a healthcare request form that he attempted to direct to HSA Hobson. Dkt. 119-6, ¶ 7. HSA Hobson attests that when these forms are submitted, they are triaged by the nursing staff, and that she may not receive them directly. *Id.* Mr. Smith wanted to be seen by medical related to an arm sling and a therapy band that had been confiscated when he was moved to the CCU. *Id.* A non-party nurse responded that Mr. Smith had been placed in the CCU due to his conduct and that custody staff was emailed about the arm sling and therapy band. *Id.* The nurse reminded him that his medication was PRN and must be taken in front of staff. *Id.* HSA Hobson had no direct involvement but believed the nurse's response to be appropriate. *Id.*; *see also* dkt. 119-1 at 98 (copy of request form).

The medical record indicates after Mr. Smith was moved to the CCU, he refused certain medication and was non-compliant with dressing changes. Dkt. 134 at 1-8, 65-66, 68-69 (dressing changes, would not take Naproxen, refused visits). Mr. Smith's testimony indicates he believed he could do dressing changes on his own and did so while he was at Wabash Valley, perhaps both in the infirmary and CCU.[15] *Id.* at 362. He also stated there were times he would not see a nurse because he was in pain. *Id.* at 369. And that, issues in the record of his refusing care were in part due to custody staff telling him he could not be cuffed in front because they did not have medical instructions to do so, and then never coming back to his cell and instead telling medical that he refused to be seen. Dkt. 132 at 3.

Mr. Smith had a follow-up appointment with the surgeon on May 13, 2019. Dkt. 134 at 215-216. The surgeon recommended removal of the external fixator and manipulation of Smith's elbow under anesthesia within a month. *Id.* Dr. Rajoli met with him on May 20, 2019, and noted his condition was stable. Dkt. 119-5, ¶ 5. Dr. Rajoli reviewed the surgeon's recommendation that Mr. Smith take Naproxen twice per day for a month for pain relief purposes, and he continued this prescription. *Id.* Dr. Rajoli attests that Mr. Smith demanded to receive Tylenol 3, three times per day, but he "advised against it based on clinical guidelines." *Id.* Dr. Rajoli did continue Tylenol 3, twice per day, as was previously ordered, "after which, the order would expire to limit the use of a narcotic." *Id.*; *see also* dkt. 134 at 70, 72 (receiving Tylenol 3 on May 25, 2019).

On May 19, 2019, Mr. Smith submitted a healthcare request form that he attempted to direct to HSA Hobson or Dr. Byrd about the fact that custody staff was not honoring an order

---

[15] Mr. Smith attests he "saw busy nurses and [there was] no need for them to remove bandages when I could do it on my own . . . . as I have managed many of wound care in my past on self or others. Some nurses I now see tried to create issue to this act of kindness to them." Dkt. 134 at 362.

requiring that only soft restraints be used on him.[16] Dkt. 119-6, ¶ 8; *see also* dkt. 119-1 at 99 (copy of request form). The request was received by the medical department on May 30, 2019, which is when Dr. Byrd attests he was contacted about Mr. Smith's refusal to come out of his cell for nurses to apply antibiotic treatment to the pin sites of the external fixator system. Dkt. 119-6, ¶ 8; dkt. 119-4, ¶ 15. The nursing staff believed the pin sites were infected. Dkt. 119-4, ¶ 15. The medical record indicated that Tylenol 3 had a stop date of May 28, 2019. Dkt. 119-1 at 197. Dr. Byrd discussed Mr. Smith's pain management with Dr. Rajoli on May 30, 2019, and Dr. Rajoli did not believe opiates were indicated at that time; Dr. Byrd ordered that Tylenol 500 mg be added with the existing Naproxen prescription. *Id.* at 11-12, 197.

Dr. Byrd met with Mr. Smith on June 4, 2019, for a chronic care appointment, and his chronic pain was addressed. Dkt. 119-4, ¶ 16. Related to his elbow, the surgeon "was requesting removal of the external fixator and an additional procedure based on his overall condition and progress after the first surgery," and Mr. Smith agreed to the surgeon's recommendation. *Id.* Dr. Byrd did not identify any infection of the pin sites but out of caution continued Mr. Smith's prescription for antibiotics. *Id.* Tylenol and Naproxen orders were also in place. *Id.* Mr. Smith reported that he believed he should be getting Tylenol 3 at this time, but Dr. Byrd noted that the notes from the surgeon were reviewed from May 14, 2019, and the surgeon suggested that Tylenol 3 was not needed. Dkt. 119-1 at 6-10; *see also* dkt. 134 at 215-216 (surgeon's notes state: "At this point, the patient is 7-1/2 weeks out from the above listed procedure . . . . From a pain control standpoint, we are okay with giving him ibuprofen/NSAIDs as well as Tylenol at the prison's discretion.").

---

[16] Mr. Smith's exhibits indicate that he had a soft restraint order "per Major Russell and Dr. Byrd," at this time, when Smith complained that it was custody staff, not medical providers, who were not using proper cuffing restraints. *See* dkt. 133 at 58 (response to May 18, 2019, request for healthcare form), *id.* at 60 (response to May 29, 2019, request for healthcare form indicated soft restraint order was emailed).

On June 11, 2019, Dr. Mitcheff approved Mr. Smith to receive the recommended pre-operative testing from the surgeon prior to having his external fixator removed. Dkt. 119-7, ¶ 11; dkt. 119-2 at 2. Mr. Smith went to this appointment on June 13, 2019, and while travelling back to Wabash Valley, he was injured during the vehicle transport.[17] Dkt. 119-1 at 4. The transporting officers took Mr. Smith back to the hospital that day where he was diagnosed with a broken clavicle. *Id.*; dkt. 134 at 217-228 (emergency room x-rays of clavicle, humerus, forearm, shoulder, and scapula taken, and CT of shoulder taken).[18] Dr. Byrd was notified of the accident and ordered two Tylenol 3s to be administered that day, and Mr. Smith was scheduled for a follow-up several days later. Dkt. 119-4, ¶ 17; dkt. 119-1 at 5. On June 18, 2019, Mr. Smith refused to be seen. Dkt. 119-4, ¶ 18; dkt. 134 at 9 (Mr. Smith "refused to be put in a negative situation with Dr. Rajoli."). Mr. Smith does not dispute that he refused certain appointments.[19] *See, e.g.,* dkt. 134 at 369.

Dr. Mitcheff approved Mr. Smith's follow-up with the surgeon to have his external fixator removed, and it was removed on June 20, 2019. Dkt. 119-2 at 3; dkt. 134 at 229-31. The surgeon recommended that Mr. Smith return for further follow-up within two to four weeks, and at that

---

[17] Mr. Smith has a pending action related to this incident in this District. In *Smith v. Price*, No. 1:21-cv-00373-JMS-CSW, he pursues a First Amendment claim that a correctional officer retaliated against him by not securing him in a seatbelt during the transport due to his filing of grievances at Wabash Valley and as a result he was injured in the vehicle accident, *see Price* dkt. 135 (order granting in part and denying in part summary judgment). That pending claim will be resolved via settlement or trial.

[18] Mr. Smith's medical records from the hospital indicate a recommendation to repeat CT for "further evaluation of the pulmonary nodules" that appeared on it. Dkt. 134 at 226. Mr. Smith references this finding in his summary judgment filings, but to the extent that he argues that defendants failed to provide adequate evaluation or treatment for pulmonary nodules, these are not allegations that were included in his pleadings and are not the basis on which his claims proceed. Dkt. 1; dkt. 42; dkt. 12; dkt. 56. Mr. Smith **cannot introduce new claims at summary judgment**. *See Schmees v. HC1.Com, Inc.*, 77 F.4th 483 (7th Cir. 2023) (district court did not abuse its discretion by not allowing plaintiff to amend her complaint via summary judgment briefing).

[19] In his affidavit, Mr. Smith writes: "There was also a time when I wrote Dr. Byrd and Ms. Hobson stating that I would refuse all future appointments with Dr. Rajoli because I didn't want to be in a negative position. I had real thoughts of wanting to hurt him because of his disregard, his attitude, and the physical and emotional pain that I was suffering at that time." Dkt. 134 at 369.

time, right elbow and clavicle x-rays would be taken. Dkt. 134 at 229-31. The day before his external fixator removal, Mr. Smith submitted a healthcare request form that he attempted to direct to HSA Hobson that discussed his broken clavicle and his need for pain medication. Dkt. 119-6, ¶ 9; *see also* dkt. 119-1 at 100 (copy of request form). Another nurse responded to the request two days later that Mr. Smith received a pain ball which delivered lidocaine[20] to the affected area after his surgical procedure, and that when the pain ball was removed, he would receive other pain medication. Dkt. 119-1 at 100; *see also* dkt. 134 at 81 (Smith informed by nurse on June 23, 2019, that he had routine Tylenol and the pain ball had not yet been scheduled for removal). The pain ball was removed the next day. Dkt. 134 at 82.

On June 25, 2019, Mr. Smith saw Dr. Rajoli after his follow-up from the surgeon. Dkt. 119-5, ¶ 7. Mr. Smith reported pain on the right side of his rib cage, and that while he had previous x-rays and CT scans at the hospital, his rib cage had not been examined after the accident. *Id.* Mr. Smith was receiving dressing changes and topical wound care, and Dr. Rajoli explained that "his medication would be transitioning in order to help him cope with the normal healing process after a surgical procedure." *Id.* Dr. Rajoli ordered a bilateral rib x-ray, and Mr. Smith had active prescriptions for Percocet, Trileptal, Keppra, and pain-reliever tabs. *Id.*; dkt. 119-1 at 186-89. Mr. Smith's radiology results indicated his rib was not fractured. Dkt. 133 at 67.

Mr. Smith returned to the surgeon's office on July 19, 2019, and x-rays showed that his clavicle was healing and that his elbow had progressive post-traumatic degenerative disease. Dkt. 134 at 232-37. The provider wanted to see him again "as he continues to have some shoulder concerns." *Id.* ("we will discuss this when he sees [the surgeon] at the next visit"). Mr. Smith

---

[20] A pain ball "looks like a rubber ball that is inflated," and it "holds local anesthetic which runs through a tube and into a patient via a catheter that is placed at the surgical site or in close proximity to nerves." *See Pain pumps help reduce opioid use*, *available at* www.uchealth.org (last visited Mar. 21, 2024).

testified at his deposition that the pain in his shoulder primarily started after the June 13, 2019, vehicle transport accident. Dkt. 119-13 at 17.

Mr. Smith was transferred to New Castle on July 23, 2019, and thus, Dr. Byrd, Dr. Rajoli, and HSA Hobson no longer participated in his medical care. Dkt. 119-4, ¶ 19; dkt. 119-5, ¶¶ 8-9; *see generally* dkt. 119-6.

### D. Plaintiff's Medical Interactions at New Castle

#### 1. July 2019 - December 2019

Mr. Smith saw non-defendant providers when he first arrived at New Castle, and a lower bunk was ordered for him due to his shoulder issues. *See, e.g.*, dkt. 134 at 95-107. The medical record indicates that a front cuff pass had been approved by Dr. Byrd on April 25, 2019, while Mr. Smith was at Wabash Valley, but that "the method of cuffing an offender is at the discretion of custody and is not a medical concern." *Id.* at 96.

Mr. Smith saw the surgeon again on August 26, 2019, for follow-up after removal of the external fixator and elbow manipulation under anesthesia and for management of his clavicle fracture and shoulder pain. *Id.* at 238-40. The surgeon recommended additional manipulation under anesthesia and noted that Mr. Smith "has significant shoulder pain in the glenohumeral joint region."[21] *Id.* The surgeon could not recommend an MRI for the shoulder because Mr. Smith has "some metal in his body," so he recommended a CT scan with arthrogram of the right glenohumeral joint. *Id.* ("I will have him follow up with one of my shoulder partners after that has been completed."). Mr. Smith returned to New Castle with a prescription for Gabapentin, but this

---

[21] "The glenohumeral joint is a true synovial ball-and-socket style diarthrodial joint that is responsible for connecting the upper extremity to the trunk. It is one of four joints that comprise the shoulder complex." *See Glenohumeral Joint available at* https://www.physio-pedia.com/Glenohumeral_Joint (last visited Mar. 20, 2024).

was not approved, and he was directed to continue taking Tylenol Extra Strength for pain. *Id.* at 100.

While at New Castle, Mr. Smith was approved to received four onsite physical therapy sessions for his elbow, and he attended those sessions from September 24, 2019, to October 17, 2019. *Id.* at 101-11. The physical therapist's notes indicated he "[d]id not benefit much from therapy," in terms of range of motion for his elbow, and no further sessions were approved or scheduled. *Id.*

Dr. Nwannunu saw Mr. Smith for the first time on October 15, 2019, about numbness and shoulder pain. Dkt. 119-11, ¶ 6. Dr. Nwannunu reviewed Mr. Smith's medical chart and noted that he "had a history of severe contractures of the left hand and had previously had an elbow surgery to the right arm, for which he was still receiving physical therapy." *Id.* Mr. Smith was on Trileptal, two times a day, but he reported he was not getting relief from it. *Id.* In response, Dr. Nwannunu increased Mr. Smith's Trileptal to 600 mg, twice per day. *Id.*; *see also* dkt. 119-1 at 183-85 (Mr. Smith also had an active prescription for Keppra).

Dr. Mitcheff also approved a request for pre-anesthesia testing and additional elbow manipulation under anesthesia, and Mr. Smith was sent for this treatment from the surgeon on November 19, 2019. Dkt. 119-2 at 3. The surgeon's notes indicate that Mr. Smith was examined for his elbow, his right clavicle fracture, and right shoulder pain. Dkt. 134 at 241-246. The surgeon also indicated that an MRI would not be possible but that he would recommend a CT scan with arthrogram of the right glenohumeral joint for the shoulder. *Id.* Mr. Smith returned from this appointment with a prescription for Tramadol, which was approved. *Id.* at 111. He inquired about a soft restraint order, which had been approved by Dr. Byrd earlier and was continued by Dr. Falconer. *Id.* Mr. Smith continued to have active prescriptions for Cymbalta, Keppra, Tylenol, and

Trileptal. *Id.* at 112. The medical record indicates Mr. Smith's prescription for Tylenol 3 was set to expire around November 25, 2019, and that he had requested to be re-evaluated for it due to this expiration. *Id.* at 113.

Dr. Nwannunu saw Mr. Smith on November 26, 2019, after his follow-up with the surgeon. Dkt. 119-11, ¶ 7. He noted that Mr. Smith was provided with a shoulder sling that he was wearing at the appointment, that he had minimal tenderness at the elbow and had appropriate range of motion, and that he was clinically stable. *Id.*; *see also* dkt. 119-1 at 180-82. Mr. Smith had active prescriptions for Cymbalta, Keppra, Tylenol, Trileptal, and Tylenol 3 at this time. Dkt. 119-1 at 180-82 (Tylenol 3 stop date of Dec. 2, 2019).

The medical record indicates that on November 27, 2019, a CT with arthrogram of the glenohumeral joint was requested by an onsite provider at New Castle. Dkt. 134 at 115 (The consultation form lists Dr. Falconer as the site medical provider). Dr. Mitcheff reviewed this request, but he did not approve it because he requested further information.[22] Dkt. 119-2. Specifically, Dr. Mitcheff made a further inquiry as to why a CT was needed of the shoulder when Mr. Smith had been sent offsite to see a surgeon specifically for his elbow injury. *Id.* at 3. The onsite provider responded to Dr. Mitcheff stating that Mr. Smith had complained to the surgeon about his shoulder, and the surgeon "said he would order CT of shoulder [and] have [Smith] follow up with one of his shoulder partners[.]" *Id.* Based on this response, Dr. Mitcheff "ATP'd" the CT request in lieu of an alternative treatment plan of directing the onsite provider at New Castle "to complete a good exam and advise if patient can do [activities of daily living] and [see] what staff says about his activity." *Id.*

---

[22] Dr. Mitcheff's notes indicated he "ATP'd" the request for a CT arthrogram on December 6, 2019, with these comments seeking additional information from the onsite provider at New Castle: "ATP Why does he need a shoulder procedure when they are working on his elbow? I am confused." Dkt. 119-2 at 3.

The medical record indicates that when Mr. Smith inquired about the CT request, he was informed by a non-defendant nurse on December 16, 2019, that Dr. Mitcheff had kicked back the CT request and sought further information. Dkt. 119-1 at 118. The medical record indicates the CT request was updated to answer Dr. Mitcheff's initial question, but that Dr. Mitcheff then requested "that the onsite provider do a thorough exam of shoulder before moving forward." *Id.* ("Offender tried explaining the whole back story behind the shoulder injury . . . stating that the surgeon doesn't do shoulder work, that he was going to refer him to a shoulder specialist because he believed that there was damage in the shoulder" related to the vehicle transport accident in June 2019, and Mr. Smith was advised to bring that paperwork he referenced to the provider to explain the situation when he was next seen.)

Mr. Smith was evaluated by an offsite therapist on December 4, 2019. Dkt. 134 at 116, 119, 247-256. The therapist's notes indicated Mr. Smith would benefit from a dynamic elbow splint and occupational therapy for 12 weeks to address the range of motion in his elbow. *Id.* The offsite nurse practitioner wrote Mr. Smith a prescription for Tylenol 3, but he was reminded that "it would be up to the correction[al] facility with regards to his ongoing pain control." *Id.* at 253. The medical record contains an administrative note from December 4, 2019, generated by a non-defendant LPN, that Mr. Smith returned from the offsite visit with the recommendation for Tylenol 3 for pain and the recommendation for therapy. *Id.* at 117.

Dr. Nwannunu saw Mr. Smith on December 12, 2019, to discuss renewal of his pain medication and physical therapy. Dkt. 119-11, ¶ 8. "As it was recommended that Plaintiff receive a post-surgical evaluation for physical therapy, I submitted an outpatient request asking for the PT evaluation." *Id.*; *see also* dkt. 119-1 at 47-49 ("Arrange on site physical therapy"). Mr. Smith had active prescriptions for Cymbalta, Keppra, and pain reliever tabs. Dkt. 119-1 at 179. The medical

record indicates that Mr. Smith also had Tylenol 3 starting that day and stopping on December 16, 2019. *Id.* at 177-79 (Provider visit was at 8:11 AM). Dr. Mitcheff was also updated on December 12, 2019, related to the CT request that the onsite provider "opines patient should have course PT for shoulder," and thus, Dr. Mitcheff approved Mr. Smith to go to the Hanger Clinic to get a quote for the dynamic elbow splint and "ATP'd" the request for the CT due to the onsite provider's recommendation that Mr. Smith receive physical therapy for his shoulder. Dkt. 119-2 at 3.

Nurse Lawson met with Mr. Smith on December 12, 2019, to distribute his medication. Dkt. 119-9, ¶ 8. She attests that Mr. Smith yelled and asked about Tylenol 3, but she had no record of an active order for it at that time and had not received any report about new orders. *Id.* ("Mr. Smith yelled, cursed at me, and called me names due to his belief that I was simply not giving him the medication."). Mr. Smith attests that "[i]n every conversation" he has "always been as most respectful as possible," and did not cuss at Nurse Lawson or anyone else, nor did he wish death upon anyone.[23] Dkt. 134 at 374. He attests he still had a prescription for Tylenol 3 that started on December 12, 2019, and was still active on December 16, 2019, when Nurse Lawson refused to deliver that medication. *Id.* Mr. Smith does not dispute however that he got into an argument with Nurse Lawson. *Id.* at 335-36 (Smith's Dec. 17, 2019, grievance No. 110487, "I tried to explain, we got into an argument[.]"). Nurse Lawson tried to explain that there was no order written "on his [Medication Administration Record] for Tylenol 3" and that she was not given any report about any such order, but that she would look into it once she finished med-pass on the unit. Dkt. 119-9, ¶ 8 ("Mr. Smith told me I should kill myself when I got home from work."); *see also* dkt. 119-1 at

---

[23] While Mr. Smith may not have cursed at Nurse Lawson during this incident, may not have believed he was being disrespectful, and disputes what was said during the interaction, he does not dispute that he yelled, called her names, or that he was involved in an argument with her. Dkt. 134 at 335-36. Therefore, the Court does not find that Mr. Smith's version of the events about his conduct and demeanor creates a material fact issue.

120-22 (nurse visit at 11:17 PM on Dec. 12, 2019, form does not indicate Tylenol 3 among medications, notes Smith said, "I hope you hang yourself when you get home."). Nurse Lawson then moved on from Mr. Smith and continued to pass medication out to others on the unit. Dkt. 119-9, ¶ 8.

Nurse Lawson distributed medication again on December 16, 2019, and she attests that she checked to see if there were new orders for Mr. Smith to receive Tylenol 3 before she interacted with him. *Id.*, ¶ 9. "There was no active order for Tylenol 3 as it had expired at midnight," but Mr. Smith had a bulk order of Tylenol 500 mg that he received on November 22, 2019, that was to last him through December 2019. *Id.*, ¶¶ 9, 16. Nurse Lawson verified all of this information with another nurse before seeing Mr. Smith. *Id.* He again yelled and cursed at her, and Nurse Lawson advised him if he continued to do so, "his cuff-port would not be opened by custody in order for him to receive his other prescribed medication." *Id.* She attests he continued to be threatening, and she moved on to pass medication out to others. *Id.*; *see also* dkt. 119-1 at 116.

Nurse Lawson attests that, the next day, Mr. Smith continued his threatening behaviors, she offered him a second chance to be cooperative, "but he continued to make disparaging comments," and custody would not permit his cuff-port to be opened. Dkt. 119-9, ¶ 10; *see also* dkt. 119-1 at 114 ("Was given a second chance, and offender said 'she can kiss my ass.'"). Related to December 16 and 17, Mr. Smith attests only that he was "as most respectful as possible," and that he did not curse at anyone, and that Nurse Lawson falsified medical records to say that he was the one creating the issue, but he provides no support for that assertion. Dkt. 134 at 374.

On December 19, 2019, Mr. Smith refused to uncover his light in his cell, and Nurse Lawson was unable to dispense his medication because custody would not permit the cuff-port to be opened. Dkt. 119-9, ¶ 11; *see also* dkt. 119-1 at 112. These are the only specific interactions

24

Nurse Lawson recollects that she had with Mr. Smith prior to her leaving New Castle in April 2020. Dkt. 119-9, ¶ 12.

Also on December 19, 2019, Dr. Nwannunu met with Mr. Smith to evaluate his shoulder and his ability to complete his activities of daily living. Dkt. 119-11, ¶ 9. It was Dr. Nwannunu's medical opinion that Mr. Smith could benefit from physical therapy, he noted he had previously requested this therapy, and he continued Trileptal for pain relief, in addition to Smith's other medications. *Id.*; dkt. 119-1 at 171-74 (active prescriptions for Cymbalta, Keppra, Tylenol, Trileptal, and physical therapy evaluation and treatment request); dkt. 134 at 128-29.

### 2. January 2020 - June 2021

Dr. Mitcheff's notes indicate that he reviewed the evaluation recommending that Mr. Smith should have a course of physical therapy for his shoulder and approved for him to be fitted for a dynamic elbow splint,[24] which is a type of tension splint, at the Hanger Clinic. Dkt. 119-2 at 3 (The November 2019 request for CT with arthrogram of the shoulder was not approved due to being "ATP'd."). In January 2020, the Hanger Clinic informed Dr. Mitcheff that they do not provide the dynamic elbow splint, and that they could only do a static elbow splint, which is a splint that is locked in place. *Id.* Dr. Mitcheff approved an order for a dynamic elbow splint from the hospital, and an occupational therapy appointment was scheduled for January 21, 2020. Dkt. 134 at 129. Mr. Smith testified he received a brace but in three or four months it was broken, and he told "the doctor" about it but that no one was being sent out for anything offsite due to Covid-19. Dkt. 119-3 at 18. Mr. Smith disputes that he ever received the dynamic elbow splint because it

---

[24] On July 5, 2023, defendants filed an addendum to Dr. Mitcheff's affidavit at docket 119-7. *See* dkt. 142-1. This addendum clarified Dr. Mitcheff's statement that Mr. Smith received a "dynamic shoulder splint" in his affidavit at docket 119-7; Dr. Mitcheff attests that he meant "dynamic elbow splint." *Id.*, ¶¶ 2-4 ("This is confirmed in the previously provided Utilization Management notes from 2020 . . . . I provide this addendum with my report in support of my motion for summary judgment to clarify the issue.").

was "not allowed in prison." Dkt. 150 at 1-4. He states he only received the static splint. *Id.*
("Although Smith was approved for two (2) devices, he only received one (1) . . . .).

The medical record indicates that Mr. Smith continued to complain of pain in January 2020,
his Trileptal was increased to 900 mg by another provider, and that Dr. Nwannunu's request for
physical therapy for the shoulder was approved. Dkt. 134 at 132. Around January 13, 2020,
Mr. Smith filed a formal grievance reporting that he received several injuries as a result of a vehicle
transport accident in June 2019, and that the onsite medical providers had not responded to his
requests for medical care. Dkt. 119-12, ¶ 6. HSA Hord reviewed Mr. Smith's medical records and
"it appeared that Mr. Smith had been seen by a specialist offsite to address concerns with his
shoulder immediately following the accident," that he had received a brace for his shoulder, and
that another brace had been ordered. *Id.*, ¶ 7. Further, she noted that Mr. Smith was being seen by
onsite providers. *Id.*; *see also* dkt. 119-3 at 38.[25] Other than this communication, HSA Hord attests
she had no other contact with Mr. Smith. Dkt. 119-12, ¶ 8.

On February 6, 2020, Mr. Smith reported that his shoulder was feeling better, and his
medications were reviewed and renewed by Dr. Nwannunu. Dkt. 119-1 at 168-170 (active
prescriptions for Cymbalta, Keppra, Tylenol, Trileptal, vitals were within normal limits).

Mr. Smith requested an update on the status of treatment for his shoulder on March 10,
2020, and a non-defendant nurse explained that the November 2019 CT with arthrogram request
had not been approved, as it was pending further assessment and resubmission with more
information. Dkt. 134 at 141. At that time, the medical record indicated Mr. Smith had been "fully

---

[25] HSA Hord responded to the formal grievance as follows: "The offender was seen [by] a specialist for his
elbow and shoulder. There is no confirmation from the specialist or any other doctor that there is a tear in
his shoulder. He currently has a brace and second one ordered the specialist requested. He is being seen by
our onsite provider and receiving appropriate care. Grievance Addressed." Dkt. 119-3 at 38.

assessed by NP on 1/16 but it does not look like the OPR was ever sent with her assessment." *Id.*

Dr. Nwannunu saw Mr. Smith on March 17, 2020, for his shoulder and attests that Mr. Smith "became belligerent and was demanding" that an order be issued for him to be handcuffed in front. Dkt. 119-11, ¶ 11. Mr. Smith "was already placed in a section of the dorm that had a handcuff exemption" such that "a pass was not needed." *Id.* Dr. Nwannunu noted that Mr. Smith had no other complaints during this encounter. *Id.*; dkt. 119-1 at 165-67.

Dr. Nwannunu saw Mr. Smith on March 26, 2020, to discuss the treatment plan for his shoulder and his medication. Dkt. 119-11, ¶ 12. Dr. Nwannunu observed Mr. Smith to be "clinically stable," and that he "did not have any issues that he needed addressed at this visit." *Id.*; *see also* dkt. 119-1 at 162-63 (active prescriptions for Cymbalta, Keppra, Tylenol, and Trileptal).

On May 26, 2020, Dr. Nwannunu met with Mr. Smith to address and evaluate pain medication. Dkt. 119-11, ¶ 13. Mr. Smith reported that he did not believe Trileptal was effective and asked that it be discontinued. *Id.* He asked for Neurontin for the multiple pain issues he had, which he said helped him in the past, but Dr. Nwannunu noted that Mr. Smith had not had an active prescription for that drug since he arrived at New Castle. *Id.* Dr. Nwannunu ordered Naproxen, twice per day, for two weeks, in an effort to provide additional pain relief. *Id.*; *see also* dkt. 119-1 at 159-61 (active prescriptions for Cymbalta, Keppra, and Tylenol).

Dr. Nwannunu saw Mr. Smith on August 6, 2020, for a review of pain medications and a medical pass for front-cuffing. Dkt. 119-11, ¶ 14. Dr. Nwannunu renewed a bottom bunk pass for Mr. Smith and a front-cuffing order "in case his placement within the facility changed." *Id.*; *see also* dkt. 119-1 at 156-58.

HSA Schilling was contacted around August 11, 2020, in response to a formal grievance Mr. Smith filed seeking medical treatment for pain and alleging that Wexford was denying him

proper treatment. Dkt. 119-10, ¶ 5. HSA Schilling reviewed Mr. Smith's medical records and responded to the grievance specialist that Mr. Smith's prescription for Cymbalta was not discontinued and had been delivered to him daily as ordered. *Id.*, ¶ 6. Her review also showed that Mr. Smith was prescribed other pain relief medications such that she did not believe any other action was needed at that time. *Id.*; *see also* dkt. 119-3 at 40. To her recollection, this was her only involvement in Mr. Smith's care at New Castle. *Id.*, ¶ 7.[26]

Dr. Nwannunu saw Mr. Smith on September 1 and 10, 2020, for appointments to address his ongoing concerns about pain. Dkt. 119-11, ¶ 16; dkt. 119-1 at 150-155. Dr. Nwannunu examined Mr. Smith's shoulder and evaluated stiffness and immobility of the elbow after his prior surgery, and he ordered Naproxen, twice per day. Dkt. 119-11, ¶ 15. Dr. Nwannunu later "updated the Plaintiff on the status of Naproxen 500 mg, which was deferred, and we discussed the need to request physical therapy to occur onsite due to ongoing concerns with the Covid-19 pandemic." *Id.*, ¶ 16; *see also* dkt. 119-1 at 150-52 (active prescriptions for Cymbalta, Keppra, Tylenol Extra Strength).

Mr. Smith had four sessions of physical therapy for his right shoulder pain spanning September 22, 2020, through October 13, 2020. Dkt. 134 at 165-68. When Mr. Smith began therapy the therapist's notes indicated that a rotator cuff tear was not suspected but the issue could involve the labrum, the rim of tissue or cartilage surrounding the ball-and-socket joint. *Id.* The physical therapist's notes indicated that in October, Mr. Smith reported some improvement attributed to perhaps the increase in Cymbalta, but that the source of the shoulder pain was

---

[26] HSA Schilling responded: "Mr. Smith didn't have his Cymbalta stopped. It was delivered on 6/23, 7/27, and 8/25. It has been administered to him daily." Dkt. 119-3 at 40.

unknown and that further diagnostics may be beneficial. *Id.* at 168 ("Pt. has made maximum progress with therapy at this time. No further sessions are scheduled.").

Dr. Nwannunu saw Mr. Smith on November 17, 2020, for follow-up related to his shoulder pain after his completion of physical therapy. Dkt. 119-1 at 147-49. Dr. Nwannunu ordered an x-ray of the shoulder and ensured that Mr. Smith maintained active prescriptions for Tylenol Extra Strength, Naproxen, and Keppra at this time. *Id.*, *see also* dkt. 119-11, ¶ 17. Dr. Nwannunu would not see Mr. Smith after this appointment until summer of 2021, and it is unclear when the shoulder x-ray was reviewed or by whom, but the medical record indicates that the results were normal. Dkt. 119-1 at 144-46.

Dr. Falconer saw Mr. Smith on April 21, 2021, for an unrelated injury to the scalp. Dkt. 119-8, ¶ 8; *see also* dkt. 119-1 at 86-89. Mr. Smith had hit his head on a shelf in his cell and had a laceration. Dkt. 119-8, ¶ 8. Dr. Falconer applied a numbing agent and used staples to close the wound. *Id.* Mr. Smith was directed to be seen again in ten days to remove the staples. *Id.* Dr. Falconer attests that Mr. Smith did not complain of any pain with his elbow during this appointment, and that he had active prescriptions for pain at this time. *Id.*; dkt. 119-1 at 90 (active prescriptions for Cymbalta and Keppra). Mr. Smith returned on May 6, 2021, and a nurse noted that he reported his staples "fell out," and that the wound was healed. Dkt. 119-1 at 85. Other than this interaction, Dr. Falconer was not Mr. Smith's primary treating physician at New Castle— Dr. Nwannunu was—and Dr. Falconer had "no concerns about the clinical care or treatment provided" during that time. Dkt. 119-8, ¶ 12. Dr. Falconer attests that in his position he "did not have the authority to prescribe any and all medication to offenders" and could not "send patients offsite to meet with any other medical provider," but that he first had to seek authorization from medical leadership. *Id.*, ¶ 10.

Dr. Nwannunu did not meet with Mr. Smith again until June 15, 2021, at a chronic care appointment to address his hypertension. Dkt. 119-11, ¶¶ 18-19. Dr. Nwannunu attests that Mr. Smith "became hostile and demanding"[27] when they discussed that he had never been prescribed medication for cholesterol, and he claimed nothing was done about his shoulder pain. *Id.* Dr. Nwannunu reminded Mr. Smith he had received physical therapy, x-rays, and pain relief medications, but he attests that Mr. Smith became more hostile, and he told him to leave the exam room. *Id.* Dr. Nwannunu reviewed the x-ray of Mr. Smith's shoulder "noting that it was negative for any abnormalities," and ensured that he had active prescriptions for pain. *Id.*; *see also* dkt. 119-1 at 144-46 (active prescriptions for Cymbalta, Ibuprofen, Keppra, Tylenol Extra Strength). Dr. Nwannunu did not treat Mr. Smith after June 2021. Dkt. 119-11, ¶ 20.

### 3. Mr. Smith's Current Medical Condition

The summary judgment record indicates that the November 27, 2019, CT with arthrogram request was reviewed by Dr. Mitcheff, but it was not approved due to additional information being needed specific to the shoulder injury in December 2019, and later, it was deferred in lieu of the alternative treatment plan of first directing the onsite provider to do a full exam on Mr. Smith's shoulder and to make further recommendations, which ultimately was that Mr. Smith first have a round of physical therapy for his shoulder. Dkt. 119-2 at 3. Beyond December 2019, it does not appear that any onsite provider at New Caste made any additional request for the CT with arthrogram, and thus, no new requests, nor the old request was approved while the defendants were in charge of Mr. Smith's medical care.

---

[27] Mr. Smith contends he was not disrespectful, did not curse, was not loud, and tried to cooperate with all staff, but he does not dispute that he got demanding with Dr. Nwannunu in 2021. Dkt. 134 at 372. Mr. Smith also testified regarding Dr. Nwannunu in general, that he "literally wanted to go in there and kick the guy in the head and say listen to me. You know it's just not a positive situation that I want to place myself in." Dkt. 119-13 at 8.

Mr. Smith's exhibits indicate he received a CT with arthrogram for his right shoulder in March 2022, after the filing of this lawsuit a year before, and once Centurion's tenure with the IDOC began. Dkt. 134 at 257-61 ("Findings in keeping with small full-thickness rotator cuff tear at the cranial fibers of subscapularis. No substantial arthropathy at the glenohumeral joint. Mild arthropathy of the acromioclavicular joint."). At the time of his second deposition, Mr. Smith was not receiving any further treatment for his elbow. Dkt. 119-14 at 17. And other than having March 2022 scans and a plan to see an EMG specialist, he is not receiving any additional treatment for his shoulder other than pain medication. *Id.* (Mr. Smith explained his understanding is that "it is probably connective tissue from my spine to my shoulder that's torn and not necessarily my shoulder itself."). He is currently taking Gabapentin and Cymbalta for pain, but he says Cymbalta does not help at his current dosage of it. *Id.*

### III. Discussion

As will be discussed below, Defendants are entitled to summary judgment in their favor, as the Court finds that they were not deliberately indifferent to Mr. Smith's elbow and shoulder condition, nor did they retaliate against him. Part A and B of this discussion addresses the federal claims against defendants. Because defendants are entitled to summary judgment as a matter of law on the federal claims in this action, the Court relinquishes supplemental jurisdiction over Mr. Smith's state-law negligence claims, as discussed in Part C.

### A. Eighth Amendment Deliberate Indifference Standard

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth

Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Defendants do not argue that Mr. Smith's medical condition was not objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Smith's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Smith "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- choses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Mr. Smith does not have a constitutional right to demand specific medications or treatment. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of harm."). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

### 1. Dr. Byrd

When asked why Mr. Smith was suing Dr. Byrd, he testified that he "didn't necessarily name Dr. Byrd because . . . in my opinion he did all he could to help." Dkt. 119-13 at 6 ("And he was a pretty good doctor. And he was pretty sincere about what he did[.]"). Mr. Smith testified his main concern with Dr. Byrd was his pain medication. Dkt. 119-14 at 4.

A doctor's treatment decisions are entitled to a great deal of deference. *See Petties*, 835 F.3d at 729; *Pyles*, 771 F.3d at 409. "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor was actually exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician

did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate.).

The medical record indicates, as does Mr. Smith's own testimony, that Dr. Byrd exercised his medical judgment and addressed Smith's medical needs for his elbow before and after his surgery from March 2019 through July 2019. In that time, Dr. Byrd listened to Mr. Smith's concerns about Trileptal causing him nausea and prescribed Keppra as another alternative. Though Mr. Smith disagreed with certain pharmaceutical choices because of his belief that those medications were typically used to treat other conditions, he is not entitled to the treatment of his choice, and he has not designated admissible evidence that would allow a reasonable jury to conclude that Dr. Byrd's treatment represented a significant departure from accepted professional standards.

Dr. Byrd also ensured that, while Mr. Smith had to wait for Percocet, an opiate that undisputedly could not be dispensed without the Regional Medical Director's approval, alternative pain medication—Tylenol 3—was prescribed. Mr. Smith has not designated any evidence supporting a reasonable inference that any delay in receipt of the Percocet was directly attributable to Dr. Byrd. Mr. Smith also has not designated evidence that the medication he was provided for the few days after his surgery was not a reasonable equivalent to the Percocet recommended by the surgeon given the circumstances. To the contrary, the record reflects that Mr. Smith was getting "90 mg of codeine Q6hrs PRN for opiate pain management. [Dr. Byrd] advised him 200mg of Codeine is considered an analgesic equivalent to 20mg-30mg of oxycodone. This would translate into 10mg of Oxycodone being equivalent to 100mg of Codeine at worst. [Dr. Byrd advised him] we are clearly near recommended opiate analgesic dosage." Dkt. 119-1 at 38-42. Moreover, Mr. Smith does not dispute that he reported that he believed the Percocet did not provide relief for

long when he saw Dr. Byrd for follow-up care after receiving that prescription. The medical record indicates that in response to that complaint, Tylenol 3 was reinstated and supplemented with other pain medications.

To the extent that Mr. Smith is complaining about the fact that after Percocet was provided, he did not receive his doses on time, or that any of his other pain medications were not dispensed timely, he has not designated any evidence that Dr. Byrd was responsible for dispensing any medication. Dkt. 132 at 5, 11. To the extent that Mr. Smith is complaining that his Percocet was not approved for every four hours as recommended by the surgeon, he has not designated evidence that this is attributable to Dr. Byrd, or that Dr. Byrd made a conscious choice to change the timing of this dose. Mr. Smith's response brief in opposition to summary judgment does not provide citations to the record to support any such arguments.[28] Even if Dr. Byrd had made a conscious choice as to the timing of Mr. Smith's Percocet doses, the record indicates that Mr. Smith was receiving additional medication for pain management, for example, Keppra, which was not on the surgeon's list, in combination with the other recommended treatment. *See Petties*, 836 F.3d at 728 (courts consider the totality of a prisoner's care in considering claims for deliberate indifference).

Dr. Byrd addressed additional aspects of Mr. Smith's medical care including daily dressing changes, the large bullae that developed over Smith's elbow, any potential infection and need for antibiotics, any concern for allergic reactions to the hardware, and followed other recommendations for Toradol and Naproxen as the surgeon indicated. Indeed the medical record is replete with observations from medical staff where Mr. Smith did not adhere to his treatment guidelines, for example, failing to leave the surgical site and external fixator system alone, refusing

---

[28] Mr. Smith's citations relate to the surgeon's notes, the medical record, and his personal calendar about his medication distribution. These documents in the record do not evidence how Dr. Byrd was deliberately indifferent to Mr. Smith during this time frame based on the mere fact that he was getting Percocet further apart than four hours.

to allow staff to change his dressings or only doing his own dressings, or refusing to attend appointments all together. When a screw came out of the external fixator system, Dr. Byrd immediately escalated Mr. Smith's follow-up appointment with the surgeon so that it could be successfully repaired by the provider who implanted it. When Mr. Smith broke his clavicle in June 2019, Dr. Byrd ordered Tylenol 3 for immediate pain management.

To the extent Mr. Smith contends that Dr. Byrd was deliberately indifferent because he was removed from the infirmary and placed in the CCU, the medical record indicates that Smith continued to receive treatment from Dr. Byrd, nursing staff, and additional primary providers onsite and offsite, and the CCU was an area that allowed for isolation to protect the hardware in his arm and his healing process. And Mr. Smith has not designated any admissible evidence to refute the defendants' evidence that Dr. Byrd was not responsible for the decision to move him to the CCU.  Mr. Smith's testimony that other staff told him Dr. Byrd and HSA Hobson sent him to the CCU is inadmissible hearsay, and thus, cannot defeat summary judgment. *See Cairel*, 821 F.3d at 830.

When Mr. Smith stated he was experiencing continued pain, Dr. Byrd consulted with the surgeon for any recommendations to address the situation and sent those to the Regional Medical Director. To the extent Mr. Smith contends that Dr. Byrd, or any other physician defendant was deliberately indifferent because the pain medication he was prescribed was ineffective in that his pain was not eliminated, his arguments fail. "[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain." *Leiser v. Hoffmann et al.*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). It is clear from the record that the surgeon informed Mr. Smith that the elbow surgery would not eliminate pain, and that as Mr. Smith continued to heal from the surgery in the weeks

after, Ibuprofen and NSAIDs were the recommended acceptable forms of pain relief. Further, Dr. Byrd's medical opinion was that Mr. Smith would experience some pain given the complex procedure he had and his past history of injuries prior to incarceration.

To the extent Mr. Smith argues that he did not get physical therapy immediately, he has not designated evidence of any immediate order for therapy; though the record mentioned therapy, it did not mention when. Dr. Byrd explained, in his medical judgment, that therapy so soon was not appropriate when the external fixator system was still in place and the elbow was too fragile.

No reasonable fact-finder could conclude that Dr. Byrd was deliberately indifferent to Mr. Smith's medical condition while he was housed at Wabash Valley. Accordingly, Dr. Byrd is entitled to summary judgment.

### 2. Dr. Rajoli

Mr. Smith testified he was suing Dr. Rajoli because he did not prescribe medication, did not address his shoulder, and "totally just blew me off." Dkt. 119-13 at 7-8. ("He basically, you know, sat there and worked on his computer, filled out whatever paperwork he needed to and see you later.").

The medical record indicates that Dr. Byrd was primarily treating Mr. Smith prior to May 20, 2019—the first time Smith saw Dr. Rajoli in person. To the extent Mr. Smith argues about his care before that time, because Dr. Byrd consulted with Dr. Rajoli about some treatment decisions, such as decreasing the amount of times per day Tylenol 3 was dosed, there is no evidence that Dr. Rajoli was not exercising his medical judgment. Dkt. 119-1 at 21-23. Dr. Rajoli attests that he consulted with Dr. Byrd as requested, and that he "evaluated his condition and ordered treatment plans and medication for him that [he] believed were indicated based on [his] judgment as a physician and his overall prior and ongoing treatment." Dkt. 119-5, ¶¶ 10-11 ("I believe Plaintiff

received more than appropriate care from the nursing staff, as well as from Dr. Byrd[.]"). There is no evidence that Dr. Byrd disagreed with Dr. Rajoli's provision of care. *See, e.g.*, dkt. 119-4, ¶ 20 (Byrd attests "I believe Plaintiff received more than appropriate care from the nursing staff, as well as Dr. Rajoli[.]"). But, even if the two doctors had disagreed, a disagreement alone would not establish deliberate indifference. *See Pyles*, 771 F.3d at 409.

To the extent that Mr. Smith is complaining about Dr. Rajoli's treatment decisions in the time period during his placement in the CCU, both the medical record and Mr. Smith's testimony indicate that he refused appointments with Dr. Rajoli. And Dr. Rajoli was involved in Mr. Smith's care in-person two times in May and June 2019. *See generally* dkt. 119-5. When Dr. Rajoli saw him on May 20, 2019, he continued the surgeon's recommendation for Naproxen and continued Mr. Smith's Tylenol 3 prescription at two times per day, rather than three. Although he declined to increase the prescription for Tylenol 3 at this time, and ultimately decided that it should not be renewed after it was set to expire by approximately May 28, 2019, *see* dkt. 119-1 at 197, Mr. Smith was still receiving an opiate analgesic prior to removal of the external fixator system as recommend by the surgeon's office. Further, at the May 2019, appointment with the surgeon in preparation for the removal of the external fixator later in mid-June, the record supported transition of Mr. Smith off of an opiate analgesic entirely. *See* dkt. 134 at 215-216 (surgeon's May 14, 2019, notes state: "At this point, the patient is 7-1/2 weeks out from the above listed procedure. We can now discuss the possibility of ex-fix removal . . . . From a pain control standpoint, we are okay with giving him ibuprofen/NSAIDs as well as Tylenol at the prison's discretion.").

When Dr. Rajoli saw Mr. Smith next on June 25, 2019, he did not ignore his complaints, and in particular those related to the June 13, 2019, vehicle transport accident. The record indicates Dr. Rajoli reviewed Mr. Smith's medical records, noted that many imaging tests were done at the

time of the accident, and ordered an x-ray for rib pain to supplement those previous tests, based on Mr. Smith's reported symptoms. He ensured Mr. Smith continued to maintain multiple pain relief medications which included Percocet with a start date of June 24, 2019, and stop date of June 28, 2019, Keppra, Trileptal, and pain reliever tabs. Dkt. 119-1 at 189.

No reasonable fact-finder could conclude that Dr. Rajoli was deliberately indifferent to Mr. Smith's medical needs while he was housed at Wabash Valley. Accordingly, Dr. Rajoli is entitled to summary judgment.

### 3. HSA Hobson

Mr. Smith argues that HSA Hobson could have sent his Percocet prescription to the pharmacy earlier after his surgery, so that he did not have to wait for several days to receive it, and that she could have advocated that the medication he had in the interim was not sufficient. Dkt. 132 at 10. He testified that he is suing her because he wrote to her many times about his issues with pain medication and problems with the doctors and staff, but he got no help. Dkt. 119-13 at 8.

First, to the extent Mr. Smith argues HSA Hobson did not respond to his letters, healthcare request forms, or grievances, there is no admissible evidence that she ever saw the communications he attempted to direct to her. HSA Hobson attested, and the record supports, that she did not directly receive or respond to Mr. Smith's healthcare request forms in April, May, or June 2019. Dkt. 119-6. "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).

Second, to the extent Mr. Smith believes that HSA Hobson should have ensured he received his Percocet sooner, it is undisputed that this medication had to be approved by the

39

Regional Medical Director, and thus, a brief delay for approval was to be expected. Mr. Smith has not designated evidence that HSA Hobson intentionally delayed that process, and thus any delay that may have been caused by miscommunication or mistake, would not rise to the level of deliberate indifference. Given that Mr. Smith was receiving a comparable pain medication to Percocet during this interim time, he has not shown how he was harmed by a brief delay.

To the extent Mr. Smith contends that HSA Hobson was deliberately indifferent because he was removed from the infirmary and placed in the CCU, the medical record indicates that Mr. Smith continued to receive treatment in the CCU and was isolated to protect the hardware in his arm and his healing process. Mr. Smith's testimony that other staff told him Dr. Byrd and HSA Hobson sent him to the CCU is inadmissible hearsay, and thus, cannot defeat summary judgment. *See Cairel,* 821 F.3d at 830.

No reasonable fact-finder could conclude that HSA Hobson was deliberately indifferent to Mr. Smith's medical condition while he was housed at Wabash Valley. Therefore, HSA Hobson is entitled to summary judgment.

### 4. Dr. Falconer

Mr. Smith testified he is suing Dr. Falconer because he wrote him multiple times about the lack of medical care from Dr. Nwannunu, and Dr. Falconer never responded. Dkt. 119-13 at 11 ("So as medical provider, director of health care he was overall responsible for the operation in his facility."). Mr. Smith wanted Dr. Falconer to examine him and help him with his shoulder, but he was told he had already been looked at by other providers for the issues. *Id.*

Mr. Smith has not cited to any written communication that he sent to and that was received by Dr. Falconer, let alone any communication were Dr. Falconer provided a response. It is undisputed that Mr. Smith only saw Dr. Falconer a single time in April 2021 for direct patient care

for an unrelated scalp injury, which the record indicates Dr. Falconer addressed with application of staples to close the wound and a scheduled follow-up to remove the staples. To the extent Mr. Smith raised issues with his elbow or shoulder, which the medical record and Dr. Falconer's testimony indicates he did not, it is undisputed that Dr. Falconer was not Smith's primary physician and that Dr. Falconer's review of Smith's medical treatment showed that he had been seen by the offsite surgeon multiple times, was receiving pain medication, and had received physical therapy for those concerns. Dkt. 119-8, ¶¶ 12 ("I have no concerns about the clinical care or medical treatment provided to Mr. Smith during his incarceration at New Castle.").

No reasonable fact-finder could conclude that Dr. Falconer was deliberately indifferent to Mr. Smith's medical condition while he was housed at New Castle. Accordingly, Dr. Falconer is entitled to summary judgment.

### 5. Dr. Nwannunu

Mr. Smith testified he is suing Dr. Nwannunu because he wanted a diagnosis for his shoulder, medication to lower his pain level, and a front-cuff pass. Dkt. 119-13 at 11.

The medical record indicates that Dr. Nwannunu did not ignore Mr. Smith's medical issues. Dr. Nwannunu first increased his Trileptal in response to Smith's continued reports of pain in October 2019. Over the next two months, he observed that Mr. Smith was using a shoulder sling, he examined his elbow for tenderness and range of motion, he recommended physical therapy for Smith's shoulder, and he ensured his pain management regime consisted of many options including Trileptal, Tylenol 3, and Keppra. Related to front-cuff pass concerns in early 2020, Dr. Nwannunu responded that a pass was not needed in Mr. Smith's unit, and later, in August, he did issue a front-cuff order, in case Mr. Smith's placement changed. Dr. Nwannunu also issued a bottom bunk pass

to him at that time. When Mr. Smith complained the Trileptal was not working, Dr. Nwannunu responded by ordering Naproxen for pain relief.

When the approved onsite physical therapy for Mr. Smith's shoulder concluded in the fall of 2020, and Smith complained of continued issues, Dr. Nwannunu ordered an x-ray of the shoulder in November 2020, that rendered normal results, and he ensured Smith maintained several pain medications including Tylenol Extra Strength, Naproxen, and Keppra.

To the extent Mr. Smith argues that Dr. Nwannunu should have followed up on the CT with arthrogram recommendation from the surgeon, this argument is unavailing. Dr. Mitcheff did not approve that request from the surgeon, who was treating Smith's elbow, but instead requested that a full examination of the shoulder be done onsite at New Castle. After that examination, Dr. Nwannunu determined in his medical judgment that Mr. Smith should have a course of shoulder therapy, which he received. When physical therapy concluded, Dr. Nwannunu again assessed Mr. Smith in November 2020, and ordered a shoulder x-ray to address Smith's complaint of ongoing shoulder issues. Mr. Smith would not come back to Dr. Nwannunu until summer of 2021.  And that encounter in June 2021 was to address Mr. Smith's hypertension, and due to Mr. Smith's undisputed demanding behavior, the appointment concluded; however, Dr. Nwannunu did again review the prior x-ray of Mr. Smith's shoulder which was negative for abnormalities. At this time and before the conclusion of Dr. Nwannunu's care, Mr. Smith had active prescriptions for Cymbalta, Ibuprofen, Keppra, and Tylenol Extra Strength. Dkt. 119-1 at 78. It is unclear to the Court what additional follow-up could have been taken from Dr. Nwannunu, who in his role, could not approve any CT request.

In sum, the undisputed record evidence shows that Dr. Nwannunu exercised his medical judgment through his course of treating Mr. Smith. Though Mr. Smith may have disagreed with

42

this treatment, or believed more should be done to find a cure for his shoulder, this is not enough to establish deliberate indifference. And the Court looks to the totality of care provided. *See, e.g., Tracy v. Wexford of Ind., LLC*, No. 1:20-cv-00496-JPH-TAB, 2022 WL 4599138, at *8 (S.D. Ind. Sept. 30, 2022) (defendants were not deliberately indifferent to plaintiff's nerve pain when alternative methods of various medications, a back support, physical therapy, and home exercises were prescribed (citing *Petties*, 836 F.3d at 728 (courts consider totality of a prisoner's care in considering claims for deliberate indifference)).

No reasonable fact-finder could conclude that Dr. Nwannunu was deliberately indifferent to Mr. Smith's medical condition while he was housed at New Castle. Accordingly, he is entitled to summary judgment.

### 6. Nurse Lawson

Mr. Smith claims that Nurse Lawson was deliberately indifferent to his medical needs by failing to deliver his medications during December 2019. It is undisputed that Nurse Lawson saw Mr. Smith during med-pass on several occasions—December 12, 16, 17, and 19, 2019. Mr. Smith argues that he had an active prescription for Tylenol 3 that started on December 12 and was still active on December 16. Dkt. 134 at 374.

The medical record indicates after Mr. Smith met with Dr. Nwannunu on the morning of December 12, Tylenol 3 was scheduled to start that day and was set to stop on December 16. *See* dkt. 119-1 at 177-79. Mr. Smith does not, however, designate evidence to support that this prescription did not expire before Nurse Lawson was assigned to med-pass on December 16, as she attested it had expired, and later that week, as she attested there were no further orders for it. Dkt. 119-9, ¶¶ 9-11. Therefore, the Court finds that the dispute about the Tylenol 3 order is only relevant as to December 12. But this dispute is not material. A reasonable jury could not conclude

from Dr. Nwannunu's provider notes from the morning of December 12 alone that Nurse Lawson actually knew of any updated order for Tylenol 3 that day and ignored it. At most, they could conclude that the order information was not made available to Nurse Lawson yet, that she missed the notation if it was there, or that she should have checked further for the updated information, none of which would amount to deliberate indifference. Deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (internal quotation omitted). Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks," which is not the case here. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks omitted).

To the extent that Mr. Smith argues about other medications he did not receive during these dates, it is undisputed that he had an argument with Nurse Lawson on December 12, that custody staff required his cuff-port to be closed on December 16 and 17 as a result of the situation at those times, and that on December 19, Smith was not complying with the requirements about his light, such that medication could be dispensed. Given those facts, Nurse Lawson was not deliberately indifferent by depriving Mr. Smith of medication on these few occasions. *See, e.g., Dailey v. Corizon Health*, No. 1:16-cv-01312-SEB-TAB, 2017 WL 6371695, at *2 (S.D. Ind. Dec. 12, 2017) (deprivation of Tylenol 3 of pretrial detainee involved many disputed facts but "these are of no moment because a one-day deprivation of pain medication" did not meet deliberate indifference standard on summary judgment; "a two-day delay is not enough, standing alone, to show a culpable mental state."); *see also West v. Millen*, 79 F. App'x 190 (7th Cir. 2003) (denial of two doses of pain pills because inmate was not wearing pants at med-pass was not deliberately indifferent, "an

occasional missed dose of medication, without more, does not violate the Eighth Amendment," plaintiff has not established requisite mental state). Moreover, as it relates specifically to pain medication, the record indicates that Mr. Smith was not without pain relievers in his cell, as he had been given regular Tylenol to last through December 2019.

No reasonable fact-finder could conclude that Nurse Lawson was deliberately indifferent to Mr. Smith's medical condition during med-pass on these few occasions at New Castle. Accordingly, Nurse Lawson is entitled to summary judgment.

### 7. HSA Hord

Mr. Smith admits he has never met HSA Hord. Dkt. 119-13 at 16. In his response in opposition, he claims he wrote to her for assistance with getting his right shoulder diagnosed, to inquire about physical therapy, and to discuss Nurse Lawson. Dkt. 132 at 18, 19, 23. Mr. Smith has not provided pinpoint citations to evidence that supports that Ms. Hord received any communication from him, let alone responded to it, beyond his January 2020 formal grievance about the June 2019 vehicle transport accident. Dkt. 119-3 at 38. The undisputed evidence shows that HSA Hord looked into that one grievance she was notified about and responded based on her investigation of it that Mr. Smith had been seen by the surgeon the same day as the accident, he had received a brace, an additional brace had been ordered, there was no confirmation that he had a tear in his shoulder, and that he was receiving medical care for the issues. *Id.*

HSA Hord cannot be liable under § 1983 for failing to remedy the condition about which Mr. Smith complained. *See Stankowski v. Carr*, No. 23-2458, 2024 WL 548035, at *2 (7th Cir. 2024) (affirming dismissal of complaint alleging that defendants denied him an opportunity to use an audio recording as evidence at a disciplinary hearing; stating in relevant part, "And to the extent that Stankowski sued supervisors, grievance counselors, and officials involved in his appeals, these

45

defendants cannot be liable under § 1983 for failing to remedy the condition he complained of or supervising those who allegedly violated his rights. To be liable under § 1983, a defendant must be personally responsible for the violation of a constitutional right. Thus an official who merely reviews a grievance or appeal cannot be liable for the conduct forming the basis of the grievance." (internal citations omitted)). The question is whether a reasonable jury could conclude that HSA Hord's response to Mr. Smith's grievance amounted to deliberate indifference. Based on the designated evidence, it could not, and thus she is entitled to summary judgment.

### 8. HSA Schilling

HSA Schilling attests that she had one interaction with Mr. Smith; she was contacted to respond to his August 2020 formal grievance seeking treatment for pain and alleging that Wexford was denying him treatment. Dkt. 119-10, ¶¶ 6-7. Similar to his claims against HSA Hord, Mr. Smith has not cited any evidence in his unverified response brief that contradicts HSA Schilling's testimony.[29] The undisputed evidence shows that HSA Schilling looked into this grievance and responded based on her investigation of it that Mr. Smith's Cymbalta prescription had not been discontinued, and that the medical records indicated he received it in June, July, and August of 2020, and that he continued to receive other medication for pain management, such that she did not believe any further action was needed at that time. *Id.*; dkt. 119-3 at 40.

HSA Schilling cannot be liable under § 1983 for failing to remedy the condition about which Mr. Smith complained. *See Stankowski*, 2024 WL 548035, at *2. The question is whether a reasonable jury could conclude that her response to Mr. Smith's grievance amounted to deliberate

---

[29] Mr. Smith's citations are to a letter he wrote to HSA Hobson, not Ms. Schilling, and another letter that he wrote to the Warden where someone crossed out the Warden's name and wrote Ms. Schilling's name. Dkt. 132 at 19 (The letter to the Warden is cited only to show that the Warden may refer letters to an HSA). But these are not examples of HSA Schilling's personal involvement in Mr. Smith's care other than the undisputed August 2020 grievance.

indifference. Based on the designated evidence, it could not, and thus HSA Schilling is entitled to summary judgment.

### 9. Dr. Mitcheff

Mr. Smith testified he was suing Dr. Mitcheff because "he's the director of health care so, therefore, he can ask these people or tell them to get something done." Dkt. 119-13 at 16.

It is undisputed that Dr. Mitcheff is not involved in direct patient care, and did not, during the relevant time, personally treat Mr. Smith. The medical record indicates that Dr. Mitcheff approved Mr. Smith to have an offsite elective surgical procedure for his elbow in March 2019, and that he approved multiple occasions of additional follow-up and treatment from the offsite surgeon, and the surgeon noted that Smith's elbow and shoulder pain were addressed at such appointments. Dkt. 119-2 at 2-3. Dr. Mitcheff approved further offsite pre-op testing and elbow manipulation under anesthesia by the surgeon, physical therapy for his elbow and shoulder, and for Smith to receive a dynamic elbow splint from the hospital. *Id.* Assuming Mr. Smith's contention is true that he never received such splint, he has not designated evidence that this was the fault of Dr. Mitcheff.

To the extent that Mr. Smith argues that Dr. Mitcheff could have approved his Percocet sooner, it is not clear from the record that Dr. Mitcheff was the actual individual who approved it, but even if he had, Smith has no personal knowledge or evidence that the approval process could have occurred faster, nor does he designate evidence that a three or four-day delay in receipt of this pain medication resulted in further injury when he was being treated with a pharmaceutical equivalent during the interim. Moreover, Mr. Smith does not dispute that he reported that he was not satisfied with the relief that Percocet provided, and the record indicates that Dr. Byrd and other

onsite providers explored multiple different pain relief options in response to that report and other reports of pain, during his care between March 2019 and the filing of this action in March 2021.

To the extent that Mr. Smith argues that Dr. Mitcheff should have approved the November 27, 2019, request for a CT with arthrogram, as the surgeon recommended, this argument is not persuasive. While it is true in some cases, medical leadership's decision to "ATP," or defer a recommendation for specific treatment or testing, can create issues of material fact, those circumstances have facts in stark contrast to the record before the Court in this case. *See, e.g., Dotson v. Wexford of Ind., LLC*, No. 1:20-cv-03191-JMS-TAB, 2023 WL 1928225 (S.D. Ind. Feb. 10, 2023) (summary judgment denied as to Dr. Mitcheff because he knew plaintiff would eventually need a hip replacement, plaintiff had been wheelchair bound at the outset and was continually complaining of increased pain that did not improve with injections and repeated courses of physical therapy, and where onsite providers told Mitcheff multiple times of plaintiff's increased pain and muscle wasting, and Mitcheff denied two more requests for an orthopedic referral and persisted in conservative care that was not working for 10 months).

Here, the surgeon's notes indicated that Mr. Smith's elbow and shoulder pain were discussed offsite in early 2019, and certainly following the June 2019 vehicle transport accident which Mr. Smith attributed as the point his shoulder issues started, but Smith had undisputedly been sent to the surgeon in 2019 for treatment of his elbow. The record indicates that the surgeon was not a shoulder specialist, but rather, based on Smith's reports of shoulder pain the surgeon would recommend a CT, and that any results from that would need to then be referred to one of his colleagues who treated shoulders. Dr. Mitcheff's requests for more information related to the November 2019 CT request was reasonable to clarify if and how the medical treatment had shifted from the elbow to the shoulder. When Dr. Mitcheff received answers to those questions in

December 2019, he directed the onsite provider at New Castle to fully examine Mr. Smith's shoulder, to observe his activities of daily living related to the shoulder, and to report his findings and recommendations. Based on those observations, Dr. Nwannnu's medical opinion was that Mr. Smith should have a course of physical therapy for his shoulder—prior to that time he had only had physical therapy for his elbow. Dr. Mitcheff then approved for Mr. Smith to receive physical therapy for his shoulder, and Smith was also evaluated by a therapist offsite who recommended a specific elbow splint that Dr. Mitcheff also approved. Due to the pandemic, it was necessary for Mr. Smith's physical therapy sessions for his shoulder to occur onsite and given the Covid-19 restrictions at the facility during that time, these sessions reasonably took time to begin. Those sessions concluded in the fall of 2020, and Mr. Smith continued to be assessed onsite through the end of that year and had a further x-ray of his shoulder that rendered normal results. Mr. Smith continued to have active prescriptions for pain medication throughout this time. Mr. Smith would not return for any onsite provider visits until spring and summer 2021, and in that time, Smith has not designated evidence that Dr. Mitcheff was informed of any change in his circumstances that would warrant renewal or reconsideration of the request for CT of his shoulder.

Even if a delay of receipt of a CT was attributable to Dr. Mitcheff, Mr. Smith's testimony indicates that after he received this test in 2022 which showed he had a small rotator cuff tear, he was not receiving additional treatment for his shoulder, and he was receiving similar, or even lesser non-opiate medication, for pain management. To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Petties*, 836 F.3d 722, 730-31 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Where a plaintiff offers significant evidence from which a reasonable jury could infer delayed treatment harmed him, summary judgment on the

issue of causation is rarely appropriate. *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022). Mr. Smith has not made such showing, and therefore, summary judgment on causation is nonetheless warranted where "a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury." *Id.* (cleaned up).

Finally, given the totality of care that Mr. Smith received from offsite medical professionals, and from onsite providers at both Wabash Valley and New Castle, in combination with Dr. Mitcheff's treatment approval decisions, no jury could infer that Dr. Mitcheff or the other defendants were deliberately indifferent to Mr. Smith's medical conditions. *Petties*, 836 F.3d at 727-28 (it is the "totality of the inmate's medical care" that matters for a claim of deliberate indifference); *Kaszuba v. Ghosh*, 580 F. App'x 486, 488 (7th Cir. 2014) ("[I]solated incidents of delay [do] not rise to the level of deliberate indifference.").  Accordingly, Dr. Mitcheff is entitled to summary judgment.

### 10. *Monell* Claim Against Wexford

Mr. Smith testified he is suing Wexford because "it's all about them saving money. And they deny treatment, and they save money." Dkt. 119-13 at 16.

Mr. Smith's *Monell* claim against Wexford is also unsuccessful. Because Wexford acted under color of state law by contracting to perform a government function—providing healthcare to inmates—it is treated as a government entity for purposes of Section 1983 claims. "[A] private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities," meaning it may be liable for constitutional violations caused by its policies, practices, and customs. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "The central question is aways whether an official policy, however expressed . . . caused, the constitutional

deprivation." *Id.* at 379. Put otherwise, "is the action about which plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Id.* at 381. Any claims against Wexford must be based on *Monell*, and the record fails to support a *Monell* claim against Wexford for several reasons.

First, an entity "cannot be liable under *Monell* when there is no underlying constitutional violation by" one of its employees. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (internal quotation omitted). For the reasons discussed above, the designated evidence fails to support a constitutional claim against any Wexford employee. By extension, the designated evidence fails to support a constitutional claim against Wexford. Second, Mr. Smith cannot hold Wexford liable under the common-law theory of *respondeat superior* for its employees' actions. *Howell v. Wexford Health Servs., Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). Third, no designated evidence points to any formal or articulable Wexford policy. To prove a *Monell* claim, Mr. Smith would have to present evidence of a Wexford custom or practice—but the record contains no designated evidence beyond Mr. Smith's treatment in this case. "To prove an official policy, custom, or practice within the meaning of *Monell*," a plaintiff "must show more than the deficiencies specific to his own experience, of course." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Even if the record allowed a finding that Mr. Smith's Eighth Amendment rights were violated, which it does not, it would not allow a conclusion that he was injured by a Wexford policy, practice, or custom. Therefore, Wexford is entitled to summary judgment on Mr. Smith's Eighth Amendment claims.

### B. First Amendment Retaliation

The Court next addresses Mr. Smith's First Amendment retaliation claims against defendants. To succeed on a First Amendment retaliation claim, a plaintiff must come forward

with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Whether allegedly retaliatory conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test, *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

"The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (probable cause usually defeats retaliatory arrest claim but not if plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals who did not engage in the same sort of protected speech were not). Nonetheless, "[a]llegedly protected speech cannot be proven to motivate retaliation, if there is no

evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999).

"Suspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Manuel*, 966 F.3d at 680 (cleaned up) (standing alone, fact that inmate's cell was shaken down nine minutes after he engaged in First Amendment protected activity could not create triable issue of fact as to retaliation claim because another, non-retaliatory motive existed. *Id.* at 680–81).

Mr. Smith states only in the conclusion of his response that the defendants "did retaliate against Smith by sending him to [the] segregation unit while he was still in need of help with daily activities, he could not write at times or even put on under arm deodorant," and this violated his First Amendment rights. Dkt. 132 at 33. The Court construes that Mr. Smith is referring to his removal from the Wabash Valley infirmary in April 2019, and placed in the CCU, which undisputedly did not involve any of the defendants who were not employed at Wabash Valley. Mr. Smith has designated no evidence that any of the defendants were responsible for any placement in segregation once he arrived at New Castle.

As the Court has previously discussed, Mr. Smith believes that Dr. Byrd and HSA Hobson were responsible for his movement to the CCU, but this is contradicted by his own testimony that they were not present during the incident and that it was primarily custody staff involvement. But regardless, the record, including Mr. Smith's testimony, indicates that his own disorderly conduct, which is not protected speech, resulted in the removal from the infirmary. *See, e.g.*, dkt. 119-13 at 10 (deposition testimony describing incident).

Simply put, Mr. Smith has not developed any retaliation claim in his response in opposition to summary judgment, and what he has argued about the CCU fails. *See generally* dkt. 132. As the Seventh Circuit has made clear, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accepts its version of the events." *Kelley v. Costco Wholesale Corp.*, No. 1:21-cv-01885-JMS-MPB, 2023 WL 1782688, at *13 (S.D. Ind. Feb. 3, 2023) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)). Mr. Smith has failed to meet this burden, and thus, the defendants are entitled to summary judgment on his First Amendment claims.

### C. State-Law Claims

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims when the federal claims have been dismissed. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see also* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"While the court's decision is discretionary, when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Petropoulos v. City of Chicago.*, No. 19-cv-03206, 2021 WL 1103480, at *9 (7th Cir. Mar. 23, 2021) (cleaned up). The presumption may be rebutted (1) if dismissal of the state claim would create problems under the statute of limitations; (2) if the court

has "devoted substantial resources to the dispute;" or (3) "if it is easy to resolve the state-law claims." *Id.* (internal citations omitted).

The Court finds no reason to deviate from the usual practice here. The statute of limitations will not have run on Mr. Smith's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). The Court has not expended significant resources on the pending state-law claims, and the Court does not expect that the parties' efforts with respect to those claims in discovery and briefing will go to waste. The evidence and legal research that would have been relevant in a federal case should be every bit as relevant in a state-court proceeding. Finally, as always, comity favors allowing state courts to decide issues of state law.

For these reasons, the Court exercises its discretion to **relinquish supplemental jurisdiction over Mr. Smith's state-law negligence claims** against the defendants.

## IV. Conclusion

**The clerk is directed to terminate** the IDOC as an interested party on the docket. **The clerk is directed to update the docket** from "Nurse Martin" to "Nurse Lawson" to correct the defendant's last name.

For the reasons explained above, defendants' motion for summary judgment, dkt. [117], is **GRANTED.** All federal claims against defendants are **dismissed with prejudice**.

The Court **relinquishes supplemental jurisdiction over the remaining state-law claims** against the defendants such that they are dismissed without prejudice to refiling in state court.

Final Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 3/25/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

KEVIN E. SMITH
160176
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY – Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel